# EXHIBIT A

| Court: | Circuit | County: | 41 - Raleigh | Case Number: | CC-41-2020-C-338 |
| --- | --- | --- | --- | --- | --- |
| Judge: | Darl Poling | Created Date: | 9/29/2020 | Status: | Open |
| Case Type: | Civil | Case Sub-Type: | Tort | Security Level: | Public |
| Style: | Timothy Reed v. Marfork Coal Company, LLC | | | | |

| # | Entered Date | Event | Ref. Code | Description |
| --- | --- | --- | --- | --- |
| 1 | 9/29/2020 11:44:32 AM | E-Filed | | Complaint |
| 2 | 9/29/2020 11:44:32 AM | Judge Assigned | J-41004 | Darl Poling |
| 3 | 9/29/2020 11:44:32 AM | Party Added | P-001 | Timothy Reed |
| 4 | 9/29/2020 11:44:32 AM | Party Added | D-001 | Marfork Coal Company, LLC |
| 5 | 9/29/2020 11:44:32 AM | Attorney Listed | P-001 | A-7457 - Gregory A. Hewitt |
| 6 | 9/29/2020 11:44:32 AM | Service Requested | D-001 | Secretary of State - Certified - Including Copy Fee |
| 7 | 10/8/2020 10:38:30 AM | E-Docketed | | Supporting Documents - RETURN OF SERVICE ACCEPTED BY SECRETARY OF STATE ON BEHALF OF MARFORRK COAL COMPANY LLC ON 10/2/2020 (AMY) |

# SUMMONS

E-FILED | 9/29/2020 11:44 AM
CC-41-2020-C-338
Raleigh County Circuit Clerk
Paul H. Flanagan

## IN THE CIRCUIT OF RALEIGH WEST VIRGINIA
**Timothy Reed v. Marfork Coal Company, LLC**

Service Type: Secretary of State - Certified - Including Copy Fee

NOTICE TO: Marfork Coal Company, LLC, Corporation Service Company, 209 West Washington St., Charleston, WV 25302

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOU RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING O DENYING EACH ALLEGATION IN THE COMPLAINT WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED O HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE OPPOSING PARTY'S ATTORNEY:

Gregory Hewitt, 204 N Court St, Fayetteville, WV 25840

THE ANSWER MUST BE MAILED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMEN BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.

SERVICE:

9/29/2020 11:44:27 AM  /s/ Paul H. Flanagan
Date                    Clerk

RETURN ON SERVICE:

☐ Return receipt of certified mail received in this office on _____

☐ I certify that I personally delivered a copy of the Summons and Complaint to _____

☐ Not Found in Bailiwick

_____        _____
Date                    Server's Signature

E-FILED | 9/29/2020 11:44 AM
CC-41-2020-C-338
Raleigh County Circuit Clerk
Paul H. Flanagan

IN THE CIRCUIT COURT OF RALEIGH COUNTY, WEST VIRGINIA

TIMOTHY REED,

    Plaintiff,

v.                                             Civil Action No.

MARFORK COAL COMPANY, LLC,

    Defendant.

## COMPLAINT

1. The Plaintiff, Timothy Reed, is a resident of the State of West Virginia.

2. The Defendant, Marfork Coal Company, LLC (hereinafter "Marfork"), is corporation doing business in Raleigh County, West Virginia, at all times relevant herein.

3. The Plaintiff was employed by the Defendant as an out-by laborer at the Allen Powellton Mine Site in Raleigh County, West Virginia.

4. On November 8, 2018, the Plaintiff was moving palletized bags of rock dust from the unloading area at the surface warehouse to a staging area.

5. The Plaintiff was using a 930G Caterpillar Front End Loader to move the pallets of rock dust.

6. During the course of moving the pallets of rock dust, another miner asked the Plaintiff to use the Loader to which the Plaintiff agreed.

7. Normally, there are two 930G Loaders available but one had been out or service for several weeks prior to this incident.

8. While the single working 930G Loader was being used, the mine superintendent told the Plaintiff to immediately move three (3) scrap differential assemblies which were laying in the yard area.

9. The Plaintiff informed the superintendent that the only working 930G Loader was in use.

10. It is standard practice at this location to use the 930G Loader for jobs such as the one the superintendent directed the Plaintiff to do on this date.

11. When the Plaintiff brought the issue of no loader to the superintendent's attention, he was directed to move the scrap differential assemblies without the aid of the loader.

12. Without the aid of the 930G Loader, at the direction of his superintendent the Plaintiff began to manually load the differential assemblies.

13. The Plaintiff moved two of the three assemblies before when he suffered severe, and permanent injury to his back.

14. Attached as Exhibit A is the verified statement of John Green, II, P.E.

## COUNT I-DELIBERATE INTENT

15. The Plaintiff repeats and re-alleges paragraphs 1-14 as set forth herein.

16. The Plaintiff brings this action pursuant to WV Code §23-4-2 commonly known as a "deliberate intent" action.

17. The Plaintiff avers upon information and belief that the prior of fact will make the following findings:

1. A specific unsafe work condition existed which presented a high degree of risk and a strong probability of serious injury or death.

2. The Defendant, prior to the injury had factual knowledge of the existence of the specific unsafe working condition and the high degree of risk and the strong probability of serious injury or death presented by the specific unsafe working condition.

3. The specific unsafe working condition was in violation of a State or Federal safety law, rule or regulation or of a commonly accepted well known safety standard.

4. The Defendant exposed the Plaintiff to this specific unsafe working condition.

5. The Plaintiff suffered serious compensable injury in excess of the 13% whole person impairment level as required to receive under this section. The plaintiff received an award of 20%.

18. As a direct and proximate result of the acts of the Defendant as aforesaid, the Plaintiff suffered significant and permanent personal injuries, incurred medical expenses, and suffered lost wages and suffered a diminished capacity to enjoy life and past, present, and future pain and suffering.

WHEREFORE, the Plaintiff demands judgment against the Defendant for all compensatory and punitive damages allowed by law.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

PLAINTIFF,

By Counsel

/s/ Greg A. Hewitt
**Greg A. Hewitt (WVSB 7457)**
**HEWITT & SALVATORE, PLLC**
**204 North Court Street**
**Fayetteville, WV 25840**
**Phone: 304-574-0272**
**Fax:     304-574-0273**

## VERIFIED STATEMENT OF JOHN G. GREEN II, P.E.

1. I have been retained by attorney for the Plaintiff, Gregory A. Hewitt, a partner in the firm of Hewitt & Salvatore, PLLC located in Fayetteville, WV.

2. I have prepared this verified statement to be served with the Plaintiff's complaint.

3. I hold a Bachelor of Science degree in Mechanical Engineering from Lafayette College in Easton, Pennsylvania (1979). I have over thirty-five (35) years of experience in industrial and construction site safety. I am well versed in the Code of Federal Regulations (CFR) promulgated by the Occupational Health and Safety Administration (OSHA) and the Mine Safety and Health Administration (MSHA). I am an MSHA certified surface miner.

4. I am a licensed Professional Engineer in 21 States, including West Virginia (21766). My professional experience includes the application of the OSHA, MSHA, and industry consensus standards, such as American National Standards Institute (ANSI), American Society of Mechanical Engineers (ASME), American Petroleum Institute (API), and the National Institute of Occupational Health and Safety (NIOSH) to material handling process, procedures and systems. This experience includes hazard analysis, risk assessment, and the control or elimination of hazardous work site conditions.

5. I am employed as a Mechanical Engineer at Robson Forensic, Inc. and regularly perform investigations, analyses, and reconstruction of industrial and construction accidents. I provide technical reports and testimony toward the resolution of litigation involving industrial and construction site workplace safety, product defects, and mechanical engineering issues. I have no financial interest in the outcome of this matter. My CV is attached and everything therein is true and correct.

6. All of my opinions are stated within a reasonable degree of engineering and professional certainty and are subject to change should additional information become available.

7. On November 8, 2018, Tom Reed was employed by the Marfork Coal Company as an out-by laborer at the Allen Powellton Mine Site in Raleigh County, WV. Part of Reed's duties, as an out-by laborer was to move materials around the surface yard area of the underground mine site and to maintain a clean work area.

8. To aid Reed in his duties as an out-by laborer, Marfork provided two (2) 930G Caterpillar Front End Loaders to maneuver heavy materials around the yard. On the date of the incident, November 8, 2018, one of the two 930G Loaders was out of service waiting for repairs to be completed. Reed was using the only working 930G Loader to move pallets containing bags of rock dust from the surface warehouse unloading area to a staging area prior to being taken into the mine by an underground labor crew. With only one working 930G Loader available, an underground miner requested the use of the loader from Reed to move materials into the mine. Reed obliged and began to walk the yard collecting debris, trash and litter as part of daily clean-up routine.

9. Shortly after Reed began his clean-up activities, the mine superintendent drove up to Reed and requested Reed immediately move three (3) scrap differential assemblies, that had been removed from rubber tired man-trips, from the yard area where they were laying on the ground to the oil containment area approximately 100 feet away.

10. According to Reed, the differential assemblies consisted of the gear box, housing, axles, and brake/wheel rotors and estimated that the assemblies weighed approximately 110 to 120 pounds each.

11. Reed explained to the Superintendent that the underground mining crew was using the only working 930G Loader and the second loader was out of service for repairs. Reed stated that using the 930G Loader was the normal and customary method to move the scrap differential assemblies due to their weight and size.

12. Regardless of the warning issued by Reed, the Superintendent ordered Reed to move the differential assemblies to the oil containment area, as there were going to be visitors arriving at the mine site.

13. Without the availability of the 930G Loader, or any other means to assist with the movement of the differential assemblies, Reed manually lifted each of the assemblies from ground level to about his waist and walked them over to the oil containment area approximately 100 feet away. The sides of the oil containment were approximately 3 feet high requiring Reed to lift the differential assemblies slightly higher to get them inside of the containment area.

14. Reed had successfully maneuvered two of the three differential assemblies into the oil containment area and was attempting to lift the third differential assembly. Reed lifted the assembly to about his waist level and then began to turn to his right, just as he had

done on the previous two lifts, when he then felt a sharp pain in this back. This caused Reed to drop the differential assembly he was lifting and fall to his knees. Reed stated that he attempted to call for assistance on his radio but did not receive any response. After about 5 or 10 minutes, Reed was able to stand up and proceeded to walk approximately 600 yards to the mine safety office.

15. At the safety office, Reed met with the company safety representative, who told Reed to take a seat while he completed some paperwork and went to photograph the incident site. Upon the return of the safety representative to the office, Reed filled out forms to document the incident. The safety representative told Reed to drive himself to a Med Express facility for further evaluation. Reed said the safety representative met him at the Med Express facility. Reed was sent home from Med Express. Later, Reed received a call to report to the hospital for an MRI and additional tests.

16. Reed stated he had been trained by Marfork on proper lifting methods, i.e. lift with your knees not with your back. Reed said that at the time of the incident he was using proper lifting methods. Reed also said the lifting training he received did not provide any information identifying a maximum weight a person should be lifting or to obtain help with a lift. Reed further stated that he was the only employee working in the yard and no other help was available at the time he was ordered to move the differential assemblies to the oil containment area by the mine superintendent.

17. Reed was exposed to a lifting hazard when he was directed to manually lift and move the unreasonably heavy and awkwardly shaped differential assemblies from the yard into the oil containment area. The combination of hazard and exposure created an unreasonably dangerous and unsafe working condition, and was a cause of the injury to Reed.

18. Employers, such as Marfork, are required to provide their employees with the appropriate means and methods to safely perform ergonomic tasks, such as lifting and maneuvering heavy items. This includes, but is not limited to, providing suitable mobile equipment, such as the 930G Loader, to accomplish heavy lifting tasks and appropriate instruction and training to accomplish manual lifting tasks.

19. Employers and mining sites, such as Marfork and Powellton, are required to follow the regulations established by MSHA (1977) for safe mining operations and to ensure that the workplace/mine site is free of recognized hazards which could harm their employees/miners. The OSHA Code of Federal Regulations (CFR) Title 29 was created in

1970 to establish and enforce workplace safety and health standards. In 1979, MSHA and OSHA entered into an Interagency Agreement to "provide for coordination between MSHA and OSHA in all areas of mutual interest". The agreement further states:
> However, where the provisions of the Mine Act either do not cover or do not otherwise apply to occupational safety and health hazards on mine or mill sites (e.g., hospitals on mine sites) or where there is statutory coverage under the Mine Act but there exist no MSHA standards applicable to particular working conditions on such sites, then the OSHAct will be applied to those working conditions. Also, if an employer has control of the working conditions on the mine site or milling operation and such employer is neither a mine operator nor an independent contractor subject to the Mine Act, the OSHAct may be applied to such an employer where the application of the OSHAct would, in such a case, provide a more effective remedy than citing a mine operator or an independent contractor subject to the Mine Act who does not, in such circumstances, have direct control over the working conditions.

20. When no specific regulation exists under CFR Title 29, OSHA is able to site information currently available from industry and labor organizations such as ANSI, NFPA, API, ASME, or NIOSH under the General Duty Clause, Section 5(a)(1) to keep the workplace free from recognized serious hazards, including those involving lifting and handling of materials.

21. Ergonomic activities, such as the lifting and handling of materials is an area where no specific MSHA regulations are applicable nor does OSHA have a standard which sets limits on how much a person may lift or carry. OSHA does direct employers to a mathematical model developed by NIOSH, a sister agency to OSHA, which will aid employers in determining the risk of injury based on the weight of the item being lifted as well as other criteria. NIOSH has established a maximum load of 51 pounds, which is then adjusted for specific criteria such as body position/movements during the lift, how often the lift is performed, over what distance is the lift to be moved and how long the item is held, to name a few.

22. The site superintendent was informed by Reed, prior to the incident, the differential assemblies were heavy and required the use of a 930G Loader, which was unavailable at the time of the incident.

23. Regardless of the warning given by Reed, the site superintendent ordered Reed to move the differential assemblies into the oil containment area. In the absence of the 930G Loader, or any other mechanical means, Reed was compelled to manually lift and move the differential assemblies, which caused his injury.

_____
John G. Green II, PE